UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PUBLIC OFFERING PLE ANTITRUST LITIGATION | MBD No. 05 MC-10018<br><br>Case pending in District Court for the Southern District of New York 00 CV - 7804 (LMM)<br><br>Oral Argument Requested Pursuant to L.R. 7.1(D)<br><br>**AFFIDAVIT IN SUPPORT OF OBJECTION TO MAGISTRATE JUDGE'S ORDER ON MOTION TO QUASH** |

DAVID KOVEL, being duly sworn, says:

1.    I am an associate of the firm of Kirby McInerney & Squire, LLP, counsel for the plaintiffs in the captioned proceeding. I am a member of the bars of the State of New York, United States District Court for the Southern District of New York, and other federal courts. I am submitting this affidavit in support of plaintiffs' objection to the Magistrate Judge's order respecting Mr. Stuart Cable's motion to quash the plaintiffs' subpoena.

2.    Attached hereto are true and complete copies of the following documents:

A.    Magistrate Judge's Order dated March 17, 2005

B.    The operative complaint herein.

C.    The subpoena to Mr. Cable with exhibits.

D.    Letter dated March 11, 2005 from David Kovel to Stephen Townshend.

D-1.  Letter dated March 17, 2005 from Roger W. Kirby to Henry C. Dinger.

E.    Letter dated March 22, 2005 from David Kovel to Hencry C. Dinger.

E-1.  Letter dated March 23, 2005 from Henry C. Dinger to David Kovel.

3.    As the complaint avers (Exh. B, ¶¶1,16, 49-50), and as provided to the Magistrate Judge during oral argument, between 1995 and 1997, 95% IPO's in the $20-80 million range bore the fixed, non-negotiable 7% underwriting fee. In addition, of 8 representations that Mr. Cable referred to in his article (Exh. D of Exh. C hereto), six were in the $20-80 million range. All were priced at 7%.

4.    Plaintiffs did not receive all the papers in respect of the emergency application prior to the hearing. We subsequently received them and noted that the affidavit of service declared that the papers had been served by mail on March 14, 2005. In fact, movant's internal postage meter showed that they were mailed the following day. One of the papers that we did not receive was Mr. Cable's affidavit.

DAVID KOVEL

Sworn to before me this
28th day of March, 2005.

Notary Public

**MARIANNE SADECKI**
Notary Public, State of New York
No. 14-4869982
Qualified in Dutchess County
Commission Expires Sept. 8, 2006

3

# EXHIBIT A

## to Objection to Magistrate Judge's Order on Motion to Quash

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: PUBLIC OFFERING PLE | ) | MBD NO. 05-10018-PBS |
| ANTITRUST LITIGATION | ) | |

## ORDER ON MOTION TO QUASH

After a telephone conference with counsel, the Motion to Quash (Docket No. 1) is allowed, without prejudice. The plaintiffs have not put forth any evidence that the proposed deponent, Attorney Stuart Cable, was in any way involved with, or has any factual information about, the transactions at issue in this litigation. The most the plaintiffs have to offer is the argument that it is statistically likely, given the breadth of Attorney Cable's experience representing issuers and underwriters in initial public offerings ("IPOs"), and the number of IPOs at issue, that he has some non-privileged factual information. However, Attorney Cable has filed an affidavit stating that he has "had no involvement, professionally or personally, with the named Plaintiffs in the underlying litigation, including no involvement whatsoever in any IPO deals in which they participated."

The record presently before the court leads to the conclusion that the plaintiffs are seeking "disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party," which is precluded by Fed. R. Civ. P. 45(c)(2)(B)(ii). See

Statutory Comm. of Unsecured Creditors v. Motorola, Inc., 218 F.R.D. 325, 326 (D.D.C. 2003) (Fed. R. Civ. P. 45(c)(3)(B)(ii) protects individuals from subpoenas seeking "to take for free the product of an individual's diligence, research, and expertise," as long as the individual's information "does not describe events or occurrences in dispute."). Consequently, the motion to quash is allowed.  The subpoena may be renewed upon a more detailed showing that the plaintiffs are seeking to depose Attorney Cable as a fact witness to "specific events or occurrences in dispute."

Attorney Cable's request for fees and costs is denied.


_____/ s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge

DATED:  March 17, 2005

-2-

# EXHIBIT B

**to Objection to Magistrate Judge's Order
on Motion to Quash**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re ISSUER PLAINTIFF INITIAL PUBLIC OFFERING ANTITRUST LITIGATION | : | Civ. No. 00-7804 (LMM) |
| | : | |
| | : | Consolidated Class Action Complaint |
| | : | |
| This Document Relates to: | : | Jury Trial Demanded |
| ALL ACTIONS | : | |
| | : | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, allege as follows upon information and belief, except for the allegations pertaining to plaintiffs, which are made upon knowledge:

1.    Beginning at least as early as January, 1994, and perhaps earlier, the exact date being unknown to plaintiffs, defendants and their co-conspirators combined and conspired to raise, fix and maintain, and did raise, fix and maintain at supra-competitive levels the fee paid by plaintiffs and class members for underwriting services given in connection with initial public offerings ("IPOs") of securities with an aggregate value between $20 million and $80 million.

2.    Defendants are underwriters of IPO securities in the United States. The IPO fee is the defendants' charge for underwriting the sales of IPO securities to the public. The underwriting fee is paid by the issuers of IPO securities, including plaintiffs and the class, directly to one or more defendants or their co-conspirators. The fee constitutes the difference between the proceeds that plaintiffs and class members receive in their respective IPO offerings and the amount for which the IPO shares are sold in the market.

3.    The greater the fee, the greater the underwriters' collective profit, and, provided that no leading underwriter engages in competition for new underwritings based upon

cutting fees, the greater the individual underwriter profit. In a <u>Wall Street Journal</u> article published April 10, 1997, the head of underwriting for an investment bank was quoted "The fact is, we'd be cutting our own throats to compete on price." In the circumstances alleged herein, this business statement would only make sense in a collusive and non-competitive market.

4.     The fee is a major source of underwriters' profits and has been called, "the last bastion of the clubby cigar-smoking world of investment banking". The underwriter fee for IPO offerings in the United States is uniformly 7% for IPOs ranging in value from $20 million to $80 million. This uniformity cannot be justified on the basis of costs and risks and would not exist in a competitive market free of collusion.

## SUBSTANTIVE ALLEGATIONS

5.     Defendants and all other IPO underwriters work together and cooperate in "syndicates" in order to sell IPO securities to the public. For a particular IPO, the syndicate is comprised of a group of underwriters, one or more of which are designated as "lead manager" or "co-managers" (hereinafter "lead manager") for the offering. When an issuer contemplates issuing IPO securities, it generally will approach several different investment banking companies in order to select one or more to serve as lead manager.

6.     The lead manager for an IPO has overall responsibility for dealings between the issuing company and a syndicate of underwriters, including the setting of the IPO fee, and for conducting due diligence. The position of lead manager for an IPO is highly sought after among underwriters, which should result in price competition for the underwriter fee, but does not.

7.  .   The position of lead manager is desirable because it receives a larger portion of the shares to be issued and thus a larger portion of  the IPO underwriting fee than do other

members of the underwriting syndicate. The lead manager also often is hired to provide investment banking or consulting services to issuers and/or to serve as lead manager for subsequent debt or equity offerings.

8.    It has recently been disclosed that lead managers may reap additional benefits from the position by obtaining cash kickbacks and/or excessive commissions from their customers in return for allocating shares of the IPO to their customers, particularly during the years 1998-2000. In December, 2000, it was first reported that the United States Attorneys Office and the Securities and Exchange Commission are investigating these allegations. The alleged arrangements especially benefit lead managers because they receive a far larger portion of the IPO shares for allocation to customers than do other syndicate members.

9.    Despite these reasons for defendant underwriters to compete among themselves for the role of lead manager by offering IPO underwriting services at fees less than 7%, there is no such price competition and almost all mid-sized IPOs are accompanied by 7% underwriter fees.

10.    The lead manager for a particular IPO has been and will again be an untitled syndicate member of other IPOs. Conversely, a particular syndicate member for an IPO will be a lead manager for other IPOs. By virtue of their interchangeable roles as lead managers and as syndicate members, and their communications with one another, defendants were and are continuously aware of the fees that underwriters have charged and are charging to offer IPO securities. This includes, but is not limited to, whether any underwriter is reducing or has reduced its fee for IPO underwriting from the standard 7%.

11.    Equity IPO offerings typically are "firm commitment" underwritings. As such,

3

the issuer company, i.e., plaintiff herein, sells all of the shares of stock offered in the IPO to the underwriters in the syndicate, and the underwriters take title to the IPO stock. Investors then purchase the IPO stock from the underwriters and take title to the stock from underwriters. Because underwriters take title to IPO stock prior to selling it to investors, underwriters bear the risk of being unable to re-sell the IPO stock to investors.

12.    In the United States, which has the most sophisticated, efficient, and highly-developed securities markets in the world, such underwriting risk is lower, generally, than for securities issued in foreign countries, where securities markets are less developed. Accordingly, the fees for IPO securities should be lower in the United States than in such foreign markets.

13.    However, as a result of the defendants' illegal combination and collusion, the IPO fee charged by defendants in the highly efficient securities markets in the United States is, on average, twice that charged in foreign markets, despite the greater risk and lower efficiencies involved in underwriting in foreign markets.

14.    The business of underwriting IPO securities involves economies of scale such that larger percentage fees should result for smaller offerings (i.e., $20 million) and smaller fees for larger offerings (i.e., $80 million). These economies include fixed costs, such as preparing a prospectus, which do not change substantially based upon the size of the offering. However, IPO fees charged at either end of the size range do not substantially differ, which would not be the case absent defendants' unlawful collusion.

15.    Moreover, the underwriting fee for an IPO offering of a given size (i.e., $40 million) for a risky or volatile company should be higher on a percentage basis than fees for an offering of the same size for a company whose value is more stable or easily determined. In fact, the

4

fee charged is the same, 7%.

16.    The clustering of IPO fee charges at exactly 7% of the proceeds of the offering

is almost complete.  From 1995 through 1997, in offerings between $20 million and $80 million,

defendants charged exactly 7% fully 95% of the time.

17.    A notice issued by the National Association of Securities Dealers' ("NASD")

to its members, including defendants herein, confirms that underwriting fees for IPOs should vary

according to the size of the offering the amount of underwriter risk involved.[1]

> In determining the maximum amount of compensation that is considered fair and reasonable, the NASD considers the size of the offering and the amount of risk assumed by the underwriter, which is determined by whether the offering is being underwritten on a firm commitment or best efforts basis and whether the offering is an initial or secondary offering. The maximum guideline amount generally will vary directly with the amount of risk assumed by the underwriter and inversely with the dollar amount of offering proceeds.  Firm commitment offerings are permitted higher levels of compensation than best efforts offerings due to the risk involved in an underwriter purchasing the securities for resale versus simply utilizing its best efforts to place the securities for the issuer. . . . The higher percentage levels of compensation permitted in smaller offerings recognizes that certain fixed costs are involved in any distribution, regardless of size.

Notice 92-53 to Members dated October 1992 discussing "Underwriting Compensation" (emphasis

added.).

18.    The large number of underwriters competing for business in IPO offerings, and

the healthy economy and stock market during 1994-2000, should have resulted, in our highly

developed and extraordinarily efficient securities markets, in lower and more competitively negotiated

fees. In fact, as the demand for IPO securities has increased and underwriter risk has decreased, and

---

[1] On information and belief, all defendants are NASD members and received this and other notices alleged herein.

5

as ancillary profits of the underwriters, both proper and improper, have increased, the percentage fees on IPO securities have held constant.

19.     Absent collusion, it is contrary to defendants' independent self-interest to adhere to the standard 7% fee. This is because an underwriter receives much higher compensation for service as a lead manager for an IPO and greater ancillary profits than for service as a syndicate member. Thus, it is in each underwriter's self-interest to compete by offering reduced fees to win the lead manager role.

20.     The benefits of the conspiracy alleged herein continue only if all defendants adhere to the combination and conspiracy to charge 7% fees. Defendants refuse to compete on the basis of price, thereby maintaining IPO fees at supra-competitive levels, in order to avoid the resulting long-term erosion in IPO fees.

21.     Thus, the effect of the joint conspiracy and combination alleged herein is to benefit all defendants despite costs to individual defendants associated with the prohibition on price competition for the role of lead manager on any particular IPO offering.

22.     The substitution of underwriters in the roles of lead managers and syndicate members in the various IPO offerings permits underwriters to enforce their illegal combination and conspiracy. For a given IPO, the underwriter defendants may coerce a particular lead manager candidate to propose a fee no lower than 7% by threatening to exclude the putative lead manager from syndicate membership in future IPO offerings.

23.     There is direct evidence of coercion exerted by defendant underwriters to enforce the agreement among them to charge only 7% underwriting fees. On March 9, 2000, defendant Prudential Securities, Inc. settled allegations made by the NASD that Prudential had

attempted to collude with competitor Friedman Billings Ramsey ("Friedman Billings") in connection

with the underwriting fee charged in the July, 1996 IPO of First Alliance Capital, Inc. ("First

Alliance").  In connection with that settlement, Prudential submitted to the NASD a Letter of

Acceptance, Waiver And Consent ("AWC"), which Prudential signed on March 2, 2000 and the

NASD accepted on March 3, 2000.

> 24.    The AWC provides that Prudential
>
> > [would] not take any action, or make or permit to be made any public
> > statement including in regulatory filings or otherwise, denying, directly
> > or indirectly, any allegation in this AWC or create the impression that
> > the AWC is without factual basis.

The AWC also provides for Prudential to accept a censure and a $100,000 fine as sanctions for the

conduct detailed in the AWC.

> 25.    In the AWC, Prudential states that Friedman Billings had offered to serve as

lead manager in the First Alliance IPO for a 6% fee, and that Prudential insisted on charging 7%.

When First Alliance refused Prudential's 7% offer in favor of Friedman Billings' 6%, Prudential

attempted to persuade Friedman Billings to withdraw its 6% offer and defer to Prudential.

Specifically, "[u]nable to convince [First Alliance] to accept a 7% spread, Prudential attempted to

achieve the lead manager position by enlisting the cooperation of [Friedman Billings]."

> 26.    On February 21, 1996, two Prudential investment bankers contacted

counterparts at Friedman Billings and "requested [Friedman Billings] to work with them and use its

influence with [First Alliance] to enable Prudential to secure the position at 7%".  At the time, the

Prudential employees knew that Friedman Billings had already offered First Alliance to serve as lead

manager for a 6% fee.

27.    On February 27, 1996, a senior Prudential investment banker called Friedman

Billings to persuade it to abandon efforts to win the First Alliance IPO with the offer to charge a 6%

fee.  In the AWC, Prudential states that its senior investment banker

> knew, at the time of his call, that the 6% spread was the only
> outstanding issue that prevented Prudential from acting as lead in
> [First Alliance's] IPO.  He also knew that [Friedman Billings] had
> informed [First Alliance] of its willingness to manage the IPO for a
> spread of 6%.... The senior investment banker's efforts, too, were
> unsuccessful and [Friedman Billings] acted as the sole and lead
> manager with an underwriting spread of 6%.

28.    In the AWC, Prudential states

> Prudential's efforts to get [Friedman Billings] to join with it to
> convince [First Alliance] that it should pay a 7% spread – a price
> [First Alliance] had already rejected – and choose Prudential as lead
> manager were improper and a violation of NASD Rule 2110.
> <u>Prudential's conduct sought to undermine competition for
> underwriting services in this transaction.</u>  (Emphasis added).

29.    In a free market untainted by collusion and price-fixing, IPO fees would be

lower than the standard 7%.  There is no independent business reason for defendants to charge the

7% fee in practically all IPO offerings.

30.    As a direct result of the illegal conspiracy among defendants to fix prices of

IPO fees:    (a) competition in the market for IPO underwriting has been and continues to be

unreasonably restrained; and (b) plaintiffs and class members paid and continue to pay excessive IPO

underwriting fees in connection with sales of IPO securities.

31.    Neither in any act of Congress, nor in any rule or regulation promulgated by

the Securities and Exchange Commission ("SEC") or NASD, is there any policy to promote,

encourage or permit defendants to secretly conspire or combine to raise, fix or maintain the IPO fees

8

at supra-competitive levels.

32.    In fact, prompted by concerns about the universal 7% fee, in 1998 the NASD issued a notice to its members warning against collusion in setting IPO fees. It states:

> NASD Regulation has noted a high degree of price uniformity in gross spreads charged by underwriters in initial public offerings of corporate equity securities. NASD Regulation considers it important to remind members that there is no standard level of underwriting compensation. Prices should be determined through competition and the level of underwriter compensation on a given transaction should be the product of negotiation between the issuer and the underwriter. The exchange of current price information among competitors in this context may raise serious anti-competitive concerns. Any attempt improperly to influence another member in its pricing is a violation of NASD Rule 2110.

33.    The defendants' secret combination and conspiracy was not disclosed to, approved by, or regulated by the NASD or the SEC.

(a)    Defendants' secret combination and conspiracy was not required by or conducted pursuant to any rule or regulation or rule of interpretation by the NASD or the SEC.

(b)    This complaint does not challenge any regulatory statute; nor is it brought pursuant to any regulatory statute; nor does it challenge any rule or regulation or rule interpretation by the NASD or the SEC.

## JURISDICTION & VENUE

3.    Plaintiffs bring this class action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 15c, and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs with respect to the injuries sustained by plaintiffs and class members arising from violations by defendants of the federal antitrust laws, including Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§

1331 and 1337(a) and 15 U.S.C. §§ 15, 15c and 26.

4.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28

U.S.C.    § 1391(b) and (c), because each of the defendants resides, or is licensed to do business

or is doing business, or is found or transacts business, in this district and/or the claims arose in this

district.

## INTERSTATE TRADE AND COMMERCE

5.    The trade and commerce relevant to this action is the issuance of IPO

securities.

6.    The events complained-of herein occurred in the flow of interstate commerce:

(a)    Issuers of IPO securities involved herein, including plaintiffs and the class, are

geographically dispersed throughout the United States;

(b)    Defendants are located in several of the United States and have operations

throughout the United States and regularly use the United States mail, telephone, wire, and electronic

communications and other instrumentalities of interstate commerce;

(c)    Investors in IPO securities who purchase such securities from defendants are

located in all of the United States.

7.    The activities of defendants and their co-conspirators, as described herein,

were within the flow of interstate trade and commerce, had substantial effect on interstate trade and

commerce, and unreasonably restrained interstate trade and commerce.

8.    Among other unreasonable restraints on interstate trade and commerce,

defendants' combination and collusion has raised the costs required of and paid by plaintiffs and class

members to sell IPO securities.

10

## PARTIES

### (Plaintiffs)

9.    Plaintiff CHS Electronics, Inc. ("CHS"), is a corporation organized under the laws of the State of Utah, with its principal place of business in Miami, Florida.

10.    Plaintiff CHS is currently reorganizing pursuant to Chapter 11 of the United States Bankruptcy Code, in proceedings styled In re CHS Electronics, Inc., No. 00-12731 (S.D. Fla. filed Apr. 4, 2000).

11.    CHS was the issuer of stock in an IPO that occurred in June, 1996. In its IPO, CHS issued 5,500,000 shares of stock at $12 per share. The underwriting fee charged was $0.84 per share, or exactly 7%. CHS received proceeds of $42,034,575, net of the underwriter fee of $4,620,000.[2]

12.    The lead manager underwriter for the CHS IPO was defendant Raymond James & Associates.

13.    Plaintiff Jeffrey A. Weinman is the Chapter 7 Trustee for the bankruptcy estate of Western Pacific Airlines, Inc. ("Western Pacific") and is authorized to bring this action on behalf of the estate. Western Pacific is a corporation organized under the laws of the State of Delaware, with its principal place of business in Denver, Colorado.

14.    Western Pacific was the issuer of stock in an IPO that occurred in December, 1995. In its IPO, Western Pacific issued 2,720,000 shares of stock at $19.00 per share. The IPO fee

---

[2] Certain "Selling Shareholders" also received a portion of the proceeds of the IPO for CHS and each other plaintiff named herein. The proceeds and fees figures alleged herein for each plaintiff do not include over-allotment options given the underwriters of the respective IPOs, which may or may not have been exercised.

charged was $1.33 per share, or exactly 7%. Western Pacific received proceeds of $48,062,400, net

of the underwriter fee of $3,617,600.

15.    The lead manager underwriters for the Western Pacific IPO were Salomon

Brothers, Inc., a predecessor of defendant Salomon Smith Barney, Inc.; Alex Brown & Sons, Inc.,

a predecessor of defendant BT Alex Brown Inc.; and defendant Hanifen, Imhoff, Inc.

16.    Plaintiff Equalnet Communications Corp., a.k.a. Equalnet Holding Corp.

("Equalnet"), is a corporation organized and existing under the laws of the State of Texas, with its

principal place of business in Houston, Texas.

17.    Equalnet was the issuer of stock in an IPO that occurred in March, 1995.

Equalnet issued 1,810,000 shares of stock at $11.00 per share. The IPO fee charged by defendants

was $0.77 per share, or exactly 7%. Equalnet received proceeds of $18,516,300 from the IPO, net

of the underwriter fee of $1,617,000.

18.    The lead manager underwriters for the Equalnet IPO were defendants J.C.

Bradford & Co. and Johnson Rice & Company.

### (Defendants)

19.    Defendant A.G. EDWARDS & SONS, INC. is a corporation organized

and existing under the laws of the State of Missouri, with its principal place of business in St. Louis,

Missouri. During the relevant time period, A.G. EDWARDS & SONS, INC. underwrote IPO

securities and acted as part of the syndicates which underwrote IPO securities for plaintiffs and class

members.

20.    Defendant BANCBOSTON ROBERTSON, STEPHENS & COMPANY is

a corporation organized and existing under the laws of the State of Delaware, with its principal place

12

of business in Atlanta, Georgia. During the relevant time period, BANCBOSTON ROBERTSON,

STEPHENS & COMPANY, underwrote IPO securities and acted as part of the syndicates which

underwrote IPO securities for plaintiffs and class members.

21.    Defendant BEAR, STEARNS & CO., INC. is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in New York,

New York. During the relevant time period, BEAR, STEARNS & CO., INC. underwrote IPO

securities and acted as part of the syndicates which underwrote IPO securities for plaintiffs and class

members.

22.    Defendant CHASE HAMBRECHT & QUIST is a corporation organized and

existing under the laws of the state of Delaware, with its principal place of business in San Francisco,

California. During the relevant time period, CHASE HAMBRECHT & QUIST and its predecessors

underwrote IPO securities and acted as part of the syndicates which underwrote IPO securities for

plaintiffs and class members. CHASE MANHATTAN CORPORATION acquired IPO underwriter

Hambrecht & Quist Group, Inc. on December 9, 1999.

23.    Defendant CIBC OPPENHEIMER CORP., is a corporation organized and

existing under the laws of the State of Delaware, with its principal place of business in New York,

New York. During the relevant time period, CIBC OPPENHEIMER CORP., and its predecessor

companies, underwrote IPO securities and acted as part of the syndicates which underwrote IPO

securities for plaintiffs and class members.

24.    Defendant COWEN & CO. is a limited partnership organized and existing

under the laws of the State of New York, with its principal place of business in New York, New

York. During the relevant time period, COWEN & CO. underwrote IPO securities and acted as part

13

of the syndicates which

25.     Defendant CREDIT SUISSE FIRST BOSTON CORPORATION is a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business in New York, New York.  During the relevant time period, CREDIT SUISSE FIRST BOSTON CORPORATION, and its predecessors, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

26.     Defendant DB ALEX. BROWN LLC (f/k/a BT ALEX BROWN INC. ) is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, DB ALEX. BROWN LLC, and its predecessor companies, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

27.     Defendant DONALDSON, LUFKIN & JENRETTE, INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, DONALDSON, LUFKIN & JENRETTE, INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

28.     Defendant EVEREN SECURITIES, INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Chicago, Illinois.  During the relevant time period, EVEREN SECURITIES INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

29.     Defendant GOLDMAN SACHS GROUP, INC. is a corporation organized and

14

existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant time period, GOLDMAN SACHS GROUP, INC. and its predecessors in interest underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

  30. Defendant HANIFEN IMHOFF INC. is a corporation with its principal place of business in Denver, Colorado. During the relevant time period, HANIFEN IMHOFF INC., and its predecessor companies, acted as part of the syndicates which underwrote IPO securities for class members and issued those IPO securities on behalf of plaintiffs and class members.

  31. Defendant ING BARINGS LLC is a limited liability corporation organized under the laws of the state of Delaware with its principal place of business in the State of New York. During the relevant time period, ING BARINGS LLC and its predecessors underwrote IPO securities and acted as part of the syndicates that issued IPO securities on behalf of plaintiffs and class members.

  32. Defendant J.C. BRADFORD & CO., is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Nashville, Tennessee. During the relevant time period, J.C. BRADFORD & CO. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members. On July 7, 2000, J.C. BRADFORD & CO. was acquired by defendant PAINE WEBBER GROUP, INC.

  33. Defendant J.P. MORGAN SECURITIES INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant time period, J.P. MORGAN SECURITIES INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

15

34.    Defendant JEFFRIES & CO., INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Los Angeles, California. During the relevant time period, JEFFRIES & CO., INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

35.    Defendant JOHNSON RICE & COMPANY is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana. During the relevant time period, JOHNSON RICE & COMPANY underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

36.    Defendant LEGG MASON WOOD WALKER INC. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Baltimore, Maryland. During the relevant time period, LEGG MASON WOOD WALKER INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

37.    Defendant LEHMAN BROTHERS INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, LEHMAN BROTHERS INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

38.    Defendant MERRILL LYNCH & CO., INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, MERRILL LYNCH & CO., and its predecessors

16

underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

39.    Defendant MORGAN STANLEY DEAN WITTER & CO., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. During the relevant time period, MORGAN STANLEY DEAN WITTER & CO., INC., and its predecessor companies, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

40.    Defendant NATIONSBANC MONTGOMERY SECURITIES is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Charlotte, North Carolina.   During the relevant time period, NATIONSBANC MONTGOMERY SECURITIES, and its predecessor companies, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

41.    Defendant PAINE WEBBER GROUP, INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.   During the relevant time period, PAINE WEBBER GROUP, INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

42.    Defendant PIPER, JAFFRAY & CO., INC. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Minneapolis, Minnesota.   During the relevant time period, PIPER, JAFFRAY & CO., INC.   underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

17

43.    Defendant PRUDENTIAL SECURITIES INCORPORATED is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, PRUDENTIAL SECURITIES INCORPORATED underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

44.    Defendant RAYMOND JAMES & ASSOCIATES, INC., is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in St. Petersburg, Florida.  During the relevant time period, RAYMOND JAMES & ASSOCIATES, INC. underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

45.    Defendant SALOMON SMITH BARNEY, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  During the relevant time period, SALOMON SMITH BARNEY, INC., and its predecessor companies, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

46.    Defendant USB WARBURG LLC is a limited liability corporation organized under the laws of the state of Delware with its principal place of business in in the State of New York. During the relevant time period, USB WARBURG LLC, and its predecessor companies, underwrote IPO securities and acted as part of the syndicates which issued IPO securities on behalf of plaintiffs and class members.

47.    The acts charged in this complaint have been done by defendants, and were ordered and performed by their officers, directors, agents, employees or representatives while actively

18

engaged in the management, direction, control or transaction of defendants' business or affairs.

## CO-CONSPIRATORS

48.    Various individuals, partnerships, corporations and associations, including other underwriters not named as defendants in this complaint, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## CLASS ACTIONS ALLEGATIONS

49.    The terms "relevant time period" or "Class Period" means the period beginning as early as January 1994, and perhaps earlier, the exact date being unknown to plaintiffs, and continuing until such time as relief has been obtained, inclusive.   The complained-of conduct is continuing as of the date of this complaint.

50.    Plaintiffs bring this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and as representatives of a class (the "Class") of all corporations and other entities (excluding defendants and their respective parents, subsidiaries and affiliates and issuers of government securities) who, during the relevant period, issued an initial public offering of securities with an aggregate value between $20 million and $80 million using the services of any defendant.[3]

51.    The members of the class number in at least the hundreds and are located throughout the United States, such that joinder of all class members in this action is impracticable.

52.    Plaintiffs' claims are typical of the claims of the members of the class because plaintiffs and all class members were damaged by the same wrongful conduct of the defendants alleged herein.

---

[3]    Plaintiffs reserve the right to amend or supplement the definition of the class, of IPO securities, and of the Class Period in their class certification motion.

53.    Plaintiffs will fairly and adequately protect the interests of the class.  The interests of plaintiffs are coincident with, and not antagonistic to, those of the class.  In addition, plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

54.    Questions of law and fact common to the members of the class predominate over those questions, if any, which may affect only individual members, because defendants have acted on grounds generally applicable to the entire class.  Among the questions of law and fact common to the class are:

(a)    Whether defendants and their co-conspirators engaged in a combination or conspiracy to raise, fix and maintain the fees at supra-competitive levels;

(b)    The duration and extent of the combination or conspiracy alleged herein;

(c)    Whether the defendants and each of them was a participant in the combination or conspiracy alleged herein.;

(d)    Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

(e)    Whether defendants fraudulently concealed their combination or conspiracy;

(f)    The effect of defendants' combination or conspiracy upon the fees charged for underwriting IPO securities;

(g)    The appropriate measure of damages; and

(h)    Whether plaintiffs and the members of the class are entitled to declaratory and/or injunctive relief.

55.    Class action treatment is superior to the alternatives, if any, for the fair and

efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

56.     Defendants have acted on grounds generally applicable to the entire class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class a whole.

## CLAIM FOR RELIEF

### CONTRACT, COMBINATION, CONSPIRACY AND AGREEMENT IN RESTRAINT OF TRADE IN VIOLATION OF SECTION ONE OF THE SHERMAN ACT

57.     Plaintiffs repeat and re-allege every allegation contained in the foregoing paragraphs.

58.     Beginning at least as early as January, 1994, and perhaps earlier, the exact date being unknown to plaintiffs, and continuing thereafter until at least as late as the date of the filing of this complaint, defendants and their co-conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

59.     The contract, combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants, leading underwriters of securities in the United States, the substantial term of which is to raise, fix and maintain at supra-

competitive levels the fee paid by plaintiffs and members of the class for issuing initial public offerings of shares of common stock in the United States.

60.    For the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants and their co-conspirators did those things which they combined and conspired to do, including, among other things, raising, fixing or maintaining their fee for IPO underwriting at supra-competitive levels.

61.    The contract, combination and conspiracy has had the following effects, among others:

(a)    Fees on IPO securities which are paid by plaintiffs and members of the class were raised, fixed, and maintained at artificially inflated and supra-competitive levels.

(b)    Defendants have increasingly standardized a 7% fee in offerings for IPOs, especially those between $20 million and $80 million in face value.

(c)    Plaintiffs and class members paid higher fees to defendants in connection with purchases and issuances of IPO securities.

62.    As a result of defendants' violation of Section 1, the plaintiffs and the class they represent have been injured in their business or property in an amount presently undetermined. During the period covered by this complaint, plaintiffs and members of the class issued substantially quantities of IPO securities underwritten by defendants. As a direct result of the combination and conspiracy of defendants and their co-conspirators, plaintiffs and members of the class paid higher fees to defendants than would have been paid in a competitive market. By reason of the alleged violations of the antitrust laws, plaintiffs and members of the class have been injured in their business and property and have suffered damages in an amount presently undetermined.

63.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs and the class have no remedy at law.

### TOLLING

64.    Throughout the relevant time period, defendants and their co-conspirators have fraudulently concealed their unlawful activities from plaintiffs and the members of the class.

65.    The applicable statute of limitations for this action was tolled by the pendency of the class action complaint In re Public Offering Fee Antitrust Litigation, No. 98 Civ. 7890 (LMM) (DFE) (S.D.N.Y.).

66.    In addition, defendants are equitably estopped from and have waived the right to assert any statute of limitations defense.  Accordingly, plaintiffs' claims against defendants and their co-conspirators are equitably tolled.

67.    Plaintiffs and the members of the class had no knowledge of the said antitrust violations, or of any facts which might have led to the discovery thereof, until November, 1998, when a complaint was filed in the matter styled In re Public Offering Fee Antitrust Litigation alleging some of the facts herein.  Plaintiffs and the members of the class could not have discovered the violations at an earlier date by the exercise of due diligence because of the self-concealing nature of the conspiracy and because the defendants employ secrecy and other practices and techniques to avoid detection of and to fraudulently conceal such violations.

68.    Because of the foregoing, customers of the defendants, including plaintiffs and the members of the class herein, were unaware of the fact that fees for underwriting IPO securities had been fixed for the period of the violation alleged in this complaint.

69.    Further, in addition to serving as underwriters of IPO securities, defendants

23

are also the predominant underwriters of follow-on and secondary equity securities offerings and of

other public securities offerings (e.g., debt securities) for issuing companies, including plaintiffs and

the class. Thus, issuers, including plaintiffs and members of the class, are dependent upon defendants

and their co-conspirators in order to access public finance markets in the United States.  Neither

plaintiffs nor the class could be expected to bring an action against defendants and their co-

conspirators when plaintiffs and the class were dependent upon defendants and their co-conspirators

to provide investment banking, consulting, and other financial services and to underwrite any future

offering of debt or equity securities.

> WHEREFORE, plaintiffs pray:

(A)    That the court determine that this action may be maintained as a class action, with

plaintiffs as class representatives, under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure;

(B)    That the unlawful combination and conspiracy alleged herein be adjudged and decreed

to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act,

15 U.S.C. §1.

(C)    That plaintiffs and the class recover damages, as provided by law, and that joint and

several judgment in favor of plaintiffs and the class be entered against defendants in an amount to be

trebled in accordance with the antitrust laws;

(D)    That defendants be preliminarily and permanently enjoined from continuing the

unlawful combination or conspiracy alleged herein;

(E)    That plaintiffs and the class recover their costs of this suit, including reasonable

attorneys' fees as provided by law; and

(F)    That plaintiffs and the class be granted such other or further relief as the nature of the

case or the interests of justice may require.

## DEMAND FOR JURY

Pursuant to Federal Rules of Civil Procedure 38(b) and otherwise, plaintiffs respectfully

demands a trial by jury.

DATED: July 6, 2001

*Randy Berger*

Alice McInerney
Randall K. Berger (RKB 1057)
KIRBY MCINERNEY & SQUIRE, LLP
830 Third Avenue
New York, New York 10022
(212) 317-2300
Fax: (212) 751-2540

David Berger
H. Laddie Montague, Jr.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
(215) 875-3000
Fax: (215) 875-4604

Craig C. Corbitt
ZELLE, HOFMANN, VOELBEL, MASON &
    GETTE, LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700
Fax: (415) 693-0770

Michael E. Criden
HANZMAN CRIDEN CHAYKIN & ROLNICK,
    P.A.
220 Alhambra Circle, Suite 400
Coral Gables, FL 33134
(305) 357-9000

25

Fax: (305) 357-9050

**PLAINTIFFS' CO-LEAD COUNSEL**

Herbert Milstein
COHEN, MILSTEIN, HAUSFELD & TOLL,
    P.L.L.C.
West Tower, Suite 500
1100 New York Avenue, N.W.
Washington, DC  20005-3964
(202) 408-4600
Fax: (202) 408-4699

Linda P. Nussbaum
COHEN, MILSTEIN, HAUSFELD & TOLL,
    P.L.L.C.
825 Third Avenue
30th Floor
New York, New York 10022
(212) 838-7797
Fax: (212) 838-7745

Stanley M. Grossman
POMERANTZ HAUDEK BLOCK GROSSMAN
    & GROSS, LLP
100 Park Avenue, 26th Floor
New York, NY 10017-5516
(212) 661-1100
Fax: (212) 661-8665

Jeff I. Ross
ZELLE, HOFMANN, VOELBEL, MASON &
    GETTE, LLP
33 South Sixth Street
City Center, Suite 4400
Minneapolis, MN 55402
(612) 339-2020
Fax: (612) 336-9100

Jay S. Horowitz
Daniel F. Wake
HOROWITZ & WAKE
3950 Republic Plaza

26

370 Seventeenth Street
Denver, CO 80202
(303) 572-5100
Fax: (303) 629-5111

**COUNSEL FOR PLAINTIFFS**

# EXHIBIT C

## to Objection to Magistrate Judge's Order
## on Motion to Quash

AO 88 (Rev. 11/91) Subpoena in a Civil Case

## United States District Court
## District of Massachusetts

-------------------------------------------------

IN RE PUBLIC OFFERING FEE
ANTITRUST LITIGATION

-------------------------------------------------

**SUBPOENA IN A**
**CIVIL CASE**
Case Pending in District Court
for the Southern District of New York
00-CV-7804 (LMM)

To: **Mr. Stuart M. Cable**
**Goodwin Procter LLP**
**Exchange Place**
**Boston, Massachusetts 02109**

---

■ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| **Goodwin Procter LLP**<br>**Exchange Place**<br>**Boston, Massachusetts 02109** | **March 17, 2005**<br>**1:00 p.m.** |

■ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):

**See Schedule A**

| | DATE AND TIME |
|---|---|
| **Goodwin Procter LLP**<br>**Exchange Place**<br>**Boston, Massachusetts 02109** | **March 10, 2005**<br>**10:00 a.m.** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify, Fed.R.Civ.P. 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_ , Attorney for Plaintiff | February 25, 2005 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
David E. Kovel, Esq., Kirby McInerney & Squire, LLP.
830 Third Avenue, 10th floor, New York, New York 10022 (212) 371-6600

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

AO 88 (11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Fed.R.Civ.P., Parts C & D:

(c)    PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)    A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents, or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)    Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection has been made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
    (i) fails to allow reasonable time for compliance;
    (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any place within the state in which the trial is held, or
    (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
    (iv) subjects a person to undue burden.

(B)    If a subpoena

    (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
    (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the

court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## DEFINITIONS AND INSTRUCTIONS

1.  The terms and procedure set forth in Rule 34 of the Federal Rules of Civil Procedure and the Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Civil Rules of the United States District Court for the Southern District of New York are incorporated herein by reference and attached as **Exhibit A**.

2.  "Underwriting fee" - means the compensation paid or contemplated for payment to underwriters in connection with the underwriting of securities.

3.  If any document is withheld from production pursuant to any claim of privilege or work product, you shall comply with the requirements of Rule 26.2 of the Civil Rules of the United States District Court for the Southern District of New York, attached as **Exhibit B**.

4.  This is a continuing request for production of documents.  If, after making your initial production, you obtain or become aware of any further document(s) responsive to this request, you are required to promptly produce such additional document(s) to plaintiffs.

5.  Documents are to be produced in full, without redaction. If any requested document cannot be produced in full, produce it to the extent possible, indicating which documents, or portion of that documents, is being withheld, and the reason that documents or portion is being withheld.

## TIME PERIOD

The relevant time period of documents requested pursuant to this subpoena shall be from November 4, 1994 to the present, and shall include all documents which relate in whole or in part to such period, or to events or circumstances during such period, even though dated, prepared, generated or received prior or subsequent to that period.

## DOCUMENTS REQUESTED

1.   All non-privileged documents and communications, including but not limited to testimony provided by you to any governmental agency or body, articles you have written or interviews you have given, concerning: (a) the pricing of underwriting fees of any securities; (b) price uniformity or price coordination in the market for underwriting fees in initial public stock offerings; and (c) possible collusion or price-fixing in the market for underwriting fees in initial public stock offerings.

2.   All non-privileged documents or communications concerning initial public stock offerings using an auction process as adverted by you in the article "Company's decision to sell shares in auction a break with IPO tradition: Novel approach aimed at achieving a 'rational' price", *The Boston Globe*, April 30, 2004 (attached as **Exhibit C**).

3.   All non-privileged documents or communications that form the basis for your assertions in the IPO Journal, Vol. 4, No. 11, November 2001, pages 11-13 (attached as **Exhibit D**) that an issuer of common stock pays a "fixed price (7% of gross)" for underwriting fees and that "the deal between [the issuer] and the banker is non-negotiable (7% of gross)."

4.   All non-privileged documents or communications related to seminars, lectures or professional meetings you have given or participated in concerning the pricing of underwriting fees in the initial public offerings of common stock.

# EXHIBIT A

made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of communication; and (iii) the general subject matter of the communication.

(b) Where a claim of privilege is asserted during a deposition, and information is not provided on the basis of such assertion, the information set forth in paragraph (a) above shall be furnished (1) at the deposition, to the extent it is readily available from the witness being deposed or otherwise, and (2) to the extent the information is not readily available at the deposition, in writing within ten business days after the deposition session at which the privilege is asserted, unless otherwise ordered by the court.

(c) Where a claim of privilege is asserted in response to discovery or disclosure other than a deposition, and information is not provided on the basis of such assertion, the information set forth in paragraph (a) above shall be furnished in writing at the time of the response to such discovery or disclosure, unless otherwise ordered by the court.

[Source: Former Local Civil Rule 46(e)(2) (Southern District Only); Eastern District Standing Order 21]

## Local Civil Rule 26.3. Uniform Definitions in Discovery Requests

(a) The full text of the definitions and rules of construction set forth in paragraphs (c) and (d) is deemed incorporated by reference into all discovery requests. No discovery request shall use broader definitions or rules of construction than those set forth in paragraphs (c) and (d). This rule shall not preclude (1) the definition of other terms specific to the particular litigation, (2) the use of abbreviations, or (3) a more narrow definition of a term defined in paragraph (c).

(b) This rule is not intended to broaden or narrow the scope of discovery permitted by the Federal Rules of Civil Procedure.

(c) The following definitions apply to all discovery requests:

(1) **Communication.** The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

(2) **Document.** The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy is a separate document within the meaning of this term.

(3) **Identify (with respect to persons).** When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

(4) **Identify (with respect to documents).** When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).

(5) **Parties.** The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This

definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

(6) **Person.** The term "person" is defined as any natural person or any business, legal or governmental entity or association.

(7) **Concerning.** The term "concerning" means relating to, referring to, describing, evidencing or constituting.

(d) The following rules of construction apply to all discovery requests:

(1) **All/Each.** The terms "all" and "each" shall be construed as all and each.

(2) **And/Or.** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

(3) **Number.** The use of the singular form of any word includes the plural and vice versa.

[Source:  Former Local Civil Rule 47]

**Local Civil Rule 26.4.  Opt-Out From Certain Provisions of Federal Rule of Civil Procedure 26 (Southern District Only) - Repealed December 1, 2000**

**Local Civil Rule 26.5.  Cooperation Among Counsel in Discovery (Eastern District Only)**

Counsel are expected to cooperate with each other, consistent with the interests of their

# EXHIBIT B

statement shall include the post office address and residence of the original owner of the claim and of any assignee.

[Source: Former Local Civil Rule 2]

**Local Civil Rule 26.2.  Assertion of Claim of Privilege**

(a)  Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, including but not limited to a deposition, and an answer is not provided on the basis of such assertion,

(1)  The attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and

(2)  The following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:

(A)  For documents:  (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;

(B)  For oral communications:  (i) the name of the person making the communication and the names of persons present while the communication was

made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of communication; and (iii) the general subject matter of the communication.

(b)   Where a claim of privilege is asserted during a deposition, and information is not provided on the basis of such assertion, the information set forth in paragraph (a) above shall be furnished (1) at the deposition, to the extent it is readily available from the witness being deposed or otherwise, and (2) to the extent the information is not readily available at the deposition, in writing within ten business days after the deposition session at which the privilege is asserted, unless otherwise ordered by the court.

(c)   Where a claim of privilege is asserted in response to discovery or disclosure other than a deposition, and information is not provided on the basis of such assertion, the information set forth in paragraph (a) above shall be furnished in writing at the time of the response to such discovery or disclosure, unless otherwise ordered by the court.

[Source:   Former Local Civil Rule 46(e)(2) (Southern District Only); Eastern District Standing Order 21]

## Local Civil Rule 26.3.  Uniform Definitions in Discovery Requests

(a)   The full text of the definitions and rules of construction set forth in paragraphs (c) and (d) is deemed incorporated by reference into all discovery requests.  No discovery request shall use broader definitions or rules of construction than those set forth in paragraphs (c) and (d).  This rule shall not preclude (1) the definition of other terms specific to the particular litigation, (2) the use of abbreviations, or (3) a more narrow definition of a term defined in paragraph (c).

# EXHIBIT C

**boston.com**

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Company's decision to sell shares in auction a break with IPO tradition

The Boston Globe

## Novel approach aimed at achieving a 'rational' price

By Charles Stein, Globe Staff | April 30, 2004

In 1995 a technology company named Netscape went public. The stock soared in price on its first day of trading, an event that captured the public's imagination and paved the way for a bull market in technology stocks.

Most technology specialists don't expect Google's initial public offering to usher in a similar period of frenzy. But on the finance side, the company's decision to sell shares to the public using an auction, rather than relying on the traditional underwriting method, could prove to be historic.

"If this offering goes off without major snafus, you may be looking at a new model," said Stuart Cable, an attorney with Goodwin Procter in Boston.

Netscape, which made a popular Internet browser, turned out to be a trailblazer on Wall Street. The company's stock was originally priced at $12 a share. Because demand for the offering was so strong, the price was lifted to $28 on the day it went public. By the end of the day, the price had skyrocketed to $58, a signal that technology stocks were a hot commodity.

"Netscape was an event," said Howard Anderson, a venture capitalist with YankeeTek in Cambridge. Anderson doesn't look for Google's sale to have so dramatic an impact. He points out that the bursting of the technology bubble in 2000 demonstrated to investors how dangerous it can be to bid up the price of technology stocks to nosebleed territory.

Many technology companies disappeared after 2000; others saw their stock prices decline more than 90 percent. Technology stocks rebounded last year, but most are still priced far below their 2000 highs.

"We are not going to see a return to the old valuations," said Anderson.

Bob Davis, the former chief executive of Lycos, now a venture capitalist with Highland Partners in Lexington, said a return to the euphoric prices of the bubble era would not be a welcome development.

"We want to see a successful IPO, but we don't want the pendulum to swing too far," he said.

Marc Klee, who runs the John Hancock Technology fund, said it would be a mistake to make generalizations based on the reaction to Google's IPO.

"This is a unique vehicle," said Klee. Unlike most firms that go public, which often are small, unprofitable, and unknown, Google is already an established part of the landscape. The company's name is a household word and the firm is already in the black. Klee doesn't expect the Google deal to trigger a wave of technology IPOs.

With its decision to sell shares through an auction, Google is making a major break with tradition. Normally firms allow their investment bankers both to set the price of IPOs and to determine who should get the shares. In the late 1990s that method came under attack. Regulators accused several big investment banks of doling out shares in hot offerings to friends and favored customers. Small investors complained they were shut out of the process. Many of the firms that went public were unhappy because the benefits of the big price gains were captured by outsiders, not the companies selling shares.

In the document it filed yesterday, Google cited many of the troubles associated with the traditional IPO process. "We believe that an auction-based IPO will minimize these problems," the company said.

Stuart Cable said an auction will mean that the investment bankers in the deal will have far less discretion than they would

have under normal circumstances. "This is an attempt to take a less arbitrary, more market-oriented approach," he said.

In its filing, Google made a similar point. "Our goal is to have an efficient market price -- a rational price set by informed buyers and sellers -- for our shares at the IPO and afterward."

*Charles Stein can be reached at stein@globe.com.* ▣

© Copyright 2004 The New York Times Company

# EXHIBIT D



*Reprinted from*

# IPO JOURNAL

## TRENDS AND TECHNIQUES FOR THE IPO PROFESSIONAL

Designed and published monthly by Bowne & Co., the world's largest financial printer, and written by the staff of Corporate Finance Institute, Inc. IPO Journal is a joint venture of Bowne Publishing Division and Corporate Finance Institute (Melissa M. Pierkowski, Executive Editor; Graeme K. Howard, Jr., Editor; David C. Glover, Research Editor; James G. Keffer, Research Associate; Carlton J. Hughes, Research Associate; Kristin L. Beane, Research Associate).

Send subscription requests and address changes to Director of Publications, Bowne, 345 Hudson Street, New York, NY 10014; Tel: (212) 229-7233; Fax: (212) 229-3421; Email: pubs@bowne.com. Send editorial questions or comments to Nancy J.F. Short, Editor, Bowne Publishing Division; Tel: (212) 229-7337; Fax: (212) 229-3421; Email: nancy.short@bowne.com or to Graeme K. Howard, Jr., Editor, IPO Journal; Tel: (410) 810-3731; Fax: (410) 810-3734; Email: ghoward@ipojournal.com.

The Bowne catalog is available by calling (800) 370-8402 or on the internet at http://www.bowne.com. The IPO Journal may not be reproduced, transmitted or stored in whole or in part in any form without the written consent of Bowne and of the Corporate Finance Institute. ©2001 Corporate Finance Institute. Design and layout ©2001 Bowne. All information is from sources believed to be reliable; however, accuracy cannot be guaranteed. No data or statement herein should be construed to be a recommendation for the purchase, retention or sale of any security and no information or opinion in this publication constitutes a solicitation or recommendation for the purchase or sale of any security. This publication is distributed with the understanding that neither the publisher nor Corporate Finance Institute is engaged in rendering legal, accounting or investment services. Information contained herein has been provided solely by the staff of Corporate Finance Institute from sources believed to be reliable. No information contained herein has been independently verified by Bowne & Co.



*Stuart Cable of Goodwin Procter:*

# Top Ten To-Do's for CEOs of the Next New Thing



**Stuart Cable**, a partner in **Goodwin Procter's** Corporate Department, represents a wide array of public and private companies involved in diverse businesses, including those involving life sciences, optical components, semiconductors, professional services, alternative energy, and software. Cable has served as chair of Goodwin Procter's Corporate Department (1991-1995), and on the firm's Executive Committee (1996-1998), and Allocations Committee (1995-2000). Cable's specific transactional experience includes initial and other public offering transactions, representing both issuers and underwriters; strategic acquisitions; and private placements of equity and debt. Cable received his J.D. from Columbia Law School, 1979; his M.B.A. from Amos Tuck School of Business Administration at Dartmouth College, 1976; and his A.B. from Dartmouth College, 1975 magna cum laude.

*What is the profile of **Goodwin Procter**?*
Cable: "We are one of the nation's leading law firms, with full service corporate and litigation practices and a team of 500 attorneys. We are headquartered in Boston, with offices in New York, New Jersey and Washington, D.C. We serve clients across a broad range of industries, providing creative solutions to complex problems and coupling practical legal advice with proactive strategic counsel."

*What is your IPO experience?*
Cable: "Serving as counsel to issuers, I have assisted a number of East Coast technology, telecommunications, and life sciences companies with their offerings, including **Albany Molecular Research, Digitas, Plug Power, Clare, Moldflow, Cognicase, Mac-Gray, StockerYale** and **Merkert American.** On the underwriter side, the investment banks I am frequently asked to represent in IPOs include **Salomon Smith Barney, U.S. Bancorp Piper Jaffray,** and **First Albany.**"

*What advice do you think the CEO of a 1998 Internet IPO that subsequently failed would have for the CEO of a company now planning to go public in the hoped-for turnaround in the IPO market?*
Cable: "I believe that a defrocked IPO veteran would tell the next generation about to enter the front lines of going public to keep his or her eye on the most important factors in the IPO process, and to avoid getting caught up in the morass of IPO detail. Here are the top ten tips I believe the veteran of going public would give the recruit as he or she left for IPO boot camp.

1. *Selecting the Investment Bankers.* Do not overcomplicate, drag out, or procrastinate making this decision. Warm them up privately in your offices with a two-hour management presentation. Include supporting historical and projected quarterly numbers and a detailed description of the size, growth rate, and competitive dynamics of the market for your products. Make your senior management team participate fully in the presentation. Invite the interested and qualified investment banks (six to eight total) to present their capabilities at a one-day 'bake-off' two weeks after the management presentations. Your key private equity investors and all Directors should be invited to attend the bake-off and to offer input into the decision. The decision should, however, ultimately be the CEO's to make. Any qualified banker suggested by an investor or Director should be invited, but the self-interest of the proponent should be carefully weighed.

   Consider carefully only limited factors when making your decision, including
   i. the reputation, track record, tenure, market presence, knowledge, and enthusiasm of the analyst (this will require external research and reference checks);
   ii. the analyst's perspective on valuation and comparable companies (an offering is priced at the back-end, and no binding valuation exists between you and the underwriter until the shares are effectively placed. Still, a discussion of the comparable companies and respective valuations will help you triangulate on an appropriate valuation); and
   iii. the reputation of the analyst for integrity and his or her ranking in the Wall Street tables. (You are known by the company you keep. In short, if a bulge bracket firm is prepared to lead manage your IPO, go for it.)

   Conversely, the long laundry list of factors regularly pitched by investment bankers should not generally be determinative of your selection of bankers. Usually on the pitch list:
   i. after market support (each will provide after market support if, and only if, it is in their economic interest to do so);
   ii. M&A services (you can always hire a different banker to run a discrete M&A project); and
   iii. access to institutional investors (in general, all high-end bankers have comparable access to the same institutional buyers).

   Subject to size and your ability to attract a high-end lead underwriter, it is preferable to have more banks on your cover than fewer (optimally four, three for smaller deals, and two for the smallest deals). You pay a fixed price (7% of gross) and coverage by three analysts is generally preferable to coverage by two.

*(...page 12)*

*("Stuart Cable of Goodwin Procter" Continued from page 11)*

2. *Cutting the Economic Deal Among Your Bankers.* The deal between you and the bankers is non-negotiable (7% of the gross). The size of the deal will be estimated on the front end ($40 million practical minimum) but finally determined on the back-end as part of the pricing. In sizing your deal, consider your need for capital, your access to complementary debt financing, and most importantly, your need to understand that equity markets are not always open. Make certain that the economics *among* underwriters are negotiated up-front and prior to the 'kick-off' meeting. You cannot leave it up to them; absent your strong hand, greed precludes consensus. Solicit their input and their walk-away point and then you need to tell them the split. You need to consider 'jump ball' versus 'pre-split economics' and combinations thereof. Make sure the economics to be paid to your lead manager are adequate to attract the high-end name, yet at the same time, don't squeeze the banker on the right to the point where he won't participate or will be unmotivated.

3. *Selecting the Professionals.* Pick a corporate lawyer who
     i.  has done it many times before, representing both issuers and underwriters,
    ii.  understands your business, and
   iii. can relate to you as a 'consigliore.'

If your start-up counsel doesn't fit the bill, give him or her a transitional role but make clear who is boss. On the accounting side, if you have a 'Big 5' firm, stay with them, but consider carefully whether you have the right team from that firm. If you don't have a Big 5 firm, switch to one unless timing precludes it. Do not involve yourself in selecting other service providers (e.g., transfer agent). Let your CFO do his job.

4. *Positioning the Company ("The Investment Thesis").* The drafting process typically involves five or six full-day 'all hands' sessions to write (and rewrite and rewrite the rewrite of) the prospectus. Attend the first and perhaps the second session, and then let the cast of thousands fine tune and complete the book. Your focus should be exclusively on the 'Business' section and specifically on the subsections entitled 'Industry Background', 'The Company's Solution' and 'Strategy'. Spend 90% of your time focused on the positioning of the company's solution and strategy as set forth in these two pages of the 60-page book. Has the industry background section been structured to set up a straw man that your solution will knock down? Is the strategy section truly forward looking and persuasive in communicating a comparative advantage? Listen to your bankers, listen to your corporate lawyer, but ultimately you must decide whether the investment thesis in these two pages is both honest and captivating.

5. *Motivating the Team.* Understand the motivating forces and golden handcuff imperatives inherent in granting stock options. Design a generous program (within the bounds of the 'cheap stock' concerns) that puts a bounce in your team's step. Consider grants throughout the company. Push your Board to be aggressive on this front, and consider the views of your CFO, your corporate lawyer, and your managing underwriter on the frequently competing concerns of dilution, incentive compensation, and cheap stock earnings charges. Do not spend any time on plan design (all omnibus plans are essentially the same); spend all of your time designing and communicating the pre-IPO grants.

6. *Selecting the Independent Directors.* You need a minimum of three. Don't overweight the 'prestige' factor, rather, pick three people who can help you in your business: (i) if you have a limited background in accounting and finance, select a financial type who can chair your Audit Committee; (ii) a Wall Street expert who can decipher the street for you; and (iii) an industry veteran (non-competitive) or expert who can fathom the trends in your business and/or technology. Motivate them well with a combination of both cash and options.

7. *Preparing for the Road.* Investment bankers don't sell securities to institutions. Prospectuses don't sell securities to institutions. CEOs sell securities to institutions based on the investor's perception of the CEO's passion, his vision, his commitment, and his integrity. Given your background, this pitch will take some work. Don't be cocky about your ability to sell. Listen to your bankers. Hire a communications expert to help you with your style. Practice in front of your corporate lawyer, your bankers, your management team, your best friend, and your spouse. Don't oversell. You will have five or six weeks after the SEC filing and before the commencement of the road show to hone your presentation.

8. *Pricing Your Deal.* The IPO process was designed by underwriters for underwriters. You will not have a meaningful opportunity to negotiate so do not delude yourself on this front. The managing underwriter (without dissent from his co-managers) will present you with the results of their order book - a *fait accompli* as to pricing with perhaps a modest decision as to sizing. For obvious reasons, the bankers will almost always recommend the larger deal. If there is excess demand, your private equity investor may be accommodated as a selling shareholder in the green shoe. Don't fight that suggestion as the added float will only help your trading.

9. *Don't Do Other People's Jobs.* Don't write the prospectus. That is the job of your corporate lawyer. Don't play with the financial statements. That is the job of your CFO. Don't write the press releases. That is the job of your CFO and IR people. Don't immerse yourself in the politics of the Friends and Family program. You will go mad. Don't even ask what is in the underwriting agreement. You won't understand it, and even if you can understand it, it is, for all practical purposes, non-negotiable.

*(...page 13)*

("Stuart Cable of Goodwin Procter" *Continued from page 12*)

10. *Run Your Company.* The most important advice of all – focus continually on running your company. Push the people, push the operation, push the strategy. An IPO is not a liquidity event; it is a starting point on the road to liquidity. You may or may not succeed in going out before the apparent IPO window closes. If you don't, you need to perform to attract the next round of private equity. If you do, the value of your stock certificate will depend over the long term less on the vagaries of the market, and more on your ability to implement your vision. In short, the ultimate destiny of your company and its stockholders (including employees) will depend not on how well you manage the IPO process, but on how well you manage the company." ▨ ·

---

Comments to jkeffer@ipojournal.com and ghoward@ipojournal.com

---

Designed and published monthly by Bowne & Co., the world's largest financial printer, and written by the staff of Corporate Finance Institute, Inc. IPO Journal is a joint venture of Bowne Publishing Division and Corporate Finance Institute (Melissa M. Pierkowski, Executive Editor; Graeme K. Howard, Jr., Editor; David C. Glover, Research Editor; James G. Keffer, Research Associate; Carlton J. Hughes, Research Associate; Kristin L. Beane, Research Associate).

Send subscription requests and address changes to Director of Publications, Bowne, 345 Hudson Street, New York, NY 10014; Tel: (212) 229-7233; Fax: (212) 229-3421; Email: pubs@bowne.com. Send editorial questions or comments to Nancy J.F. Short, Editor, Bowne Publishing Division; Tel: (212) 229-7337; Fax: (212) 229-3421; Email: nancy.short@bowne.com or to Graeme K. Howard, Jr., Editor, IPO Journal; Tel: (410) 810-3731; Fax: (410) 810-3734; Email: ghoward@ipojournal.com.

The Bowne catalog is available by calling (800) 370-8402 or on the Internet at http://www.bowne.com. The IPO Journal may not be reproduced, transmitted or stored in whole or in part in any form without the written consent of Bowne and of the Corporate Finance Institute. ©2001 Corporate Finance Institute. Design and layout ©2001 Bowne. All information is from sources believed to be reliable; however, accuracy cannot be guaranteed. No data or statement herein should be construed to be a recommendation for the purchase, retention or sale of any security and no information or opinion in this publication constitutes a solicitation or recommendation for the purchase or sale of any security. This publication is distributed with the understanding that neither the publisher nor Corporate Finance Institute is engaged in rendering legal, accounting or investment services.Information contained herein has been provided solely by the staff of Corporate Finance Institute from sources believed to be reliable. No information contained herein has been independently verified by Bowne & Co.

# EXHIBIT D

## to Objection to Magistrate Judge's Order
## on Motion to Quash

# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue*
*New York City 10022*

IRVING MALCHMAN, OF COUNSEL

**VIA FAX (617) 523 - 1231**
**& REGULAR MAIL**

March 11, 2005

Stephen H. Townsend, Esq.
**Goodwin Procter LLP**
Exchange Place
53 State Street
Boston, MA 02109

      **Re:**   **Issuer Plaintiff Initial Public Offering Antitrust Litigation**
            **00 Civ. 7804 (LMM) (DFE)**
            **(Our File No. 142.02)**

Dear Mr. Townsend:

      This letter relates to the forthcoming deposition of Stuart Cable on March 17, 2005. I am responding to your fax, sent yesterday, March 10, 2005.

      As I discussed with you by telephone, it is not our intention to take a lengthy deposition of Mr. Cable or to inconvenience him unduly. As stated in the my letter to Mr. Cable, dated February 25, 2005, for Mr. Cable's convenience we have noticed the location of this deposition as your offices at Goodwin Procter. Nor is it our intention to burden him with unnecessary production of documents. To the extent that your letter voices real concerns about the quantity of the documents that we have requested, we are more than willing to discuss your concerns and will make every effort to address them. Please note that the subpoena expressly excludes privileged documents. Your references to other possible objections based on trade-secrets, proprietary materials, and freedom of speech appear misplaced. If these objections are founded on genuine legal arguments relevant to this case, please provide us with statutory or case-law references.

      More generally, however, we are certain that a court will agree that Mr. Cable's testimony is likely to lead to the discovery of admissible evidence in our case. To that point, I refer you to cases dealing with the evidence required for proving antitrust price-fixing

KIRBY MCINERNEY & SQUIRE, LLP

Stephen H. Townsend, Esq.
**Goodwin Procter LLP**
Page 2

conspiracies, such as *In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004) and *In re High Fructose Corn Syrup*, 295 F.3d 651 (7th Cir. 2002). Mr. Cable has stated in a public journal that he has served as counsel to IPO issuers including Albany Molecular Research, Digitas, Plug Power, Clare, Moldflow, Cognicase, Mac-Gray, StockerYale, and Merkert American. *See IPO Journal*, Vol. 4, No. 11, November 2001, pages 11-13. He has also stated that he has represented IPO underwriters including Salomon Smith Barney, U.S. Bancorp Piper Jaffray, and First Albany. *See Id.* An extensive factual basis therefore exists for his assertion that the underwriting fee is "non-negotiable" and an exploration of this subject is likely to lead to the discovery of admissible evidence.

We will continue to plan for Mr. Cable's deposition on March 17, 2005.

Very truly yours,

David Kovel

cc:    Roger W. Kirby, Esq.
       Randall K. Berger, Esq.

# EXHIBIT D-1

**to Objection to Magistrate Judge's Order
on Motion to Quash**

DK

**KIRBY McINERNEY & SQUIRE, LLP**
TELEPHONE: (212) 371-6600
(212) 317-2300
FACSIMILE:   (212) 751-2540

*830 Third Avenue*
*New York City 10022*

IRVING MALCHMAN, OF COUNSEL

**VIA FAX (617) 523 - 1231**

March 17, 2005

Henry C. Dinger, P.C.
**Goodwin Procter**
Exchange Place
Boston, MA 02109

> Re    **In re Issuer Plaintiff Public Offering Fee Antitrust Litigation No. 00 Civ. 7804 (LMM) (DFE)**

Dear Mr. Dinger

      In keeping with the Magistrate Judge's ruling, and without prejudice obviously to our rights to appellate review, at least the following IPO's are within the class proceeding and where Mr. Cable served as counsel to the issuers.  This list was taken from statements made by Mr. Cable in the same IPO journal in which he stated, "You pay a fixed price (7% of gross) . . ." and that "the deal between [the issuer] and the bankers is non-negotiable (7% of the gross)."

| | |
|---|---|
| Albany Molecular Research, Inc. | (21/3/99) $50 million - 7% |
| Clare, Inc. | (6/20/95)  $50.64 Million - 7% |
| Moldflow Corp. | (3/27/00) $39 Million - 7% |
| Cognicase Inc. | (10/2/97) $38.5 Million - 7% |
| Mac-Gray Corp. | (10/17/97) $44 Million - 7% |
| Merkert American | (12/15/98) $44 Million - 7% |

Henry C. Dinger, P.C.
**Goodwin Procter**
Page 2


      We are ready to begin the deposition at 2:00 p.m. or slightly later if convenient for you and the witness.

                Yours very truly,

                Roger W. Kirby

cc    Magistrate Judith Dein
      David Kovel, Esq.

# EXHIBIT E

**to Objection to Magistrate Judge's Order
on Motion to Quash**

# KIRBY McINERNEY & SQUIRE, LLP

TELEPHONE (212) 371-6600
(212) 317-2300
FACSIMILE (212) 751-2540

*830 Third Avenue*
*New York City 10022*

——————

**VIA FAX (617) 523 - 1231
& REGULAR MAIL**

IRVING MALCHMAN, OF COUNSEL

March 22, 2005

Henry C. Dinger, Esq.
**Goodwin Procter LLP**
Exchange Place
53 State Street
Boston, MA 02109

> Re:   **Issuer Plaintiff Initial Public Offering Antitrust Litigation
> 00 Civ. 7804 (LMM) (DFE)
> (Our File No. 142.02)**

Dear Mr. Dinger:

This letter responds to your letter of March 18, 2005 in which you "strongly encourage" us to defer the deposition of Mr. Stuart Cable until after a ruling certifying the class of issuers. Mr. Cable's testimony is, however, relevant to both class certification and merits questions.

Nevertheless, we will postpone the deposition until a class is certified if Mr. Cable will agree to sit for one. One important condition to our agreement would be consent to questions about what he observed in connection with initial public offerings, including of course, non-privileged communications. Mr. Cable would maintain his right to make objections based on attorney-client privilege on a question-by-question basis.

If we cannot reach agreement by week's end, we will issue another subpoena.

Very truly yours,

David Kovel

cc:   Roger Kirby, Esq.
      Randall K. Berger, Esq.

# EXHIBIT E-1

## to Objection to Magistrate Judge's Order
## on Motion to Quash

# GOODWIN | PROCTER

Henry C. Dinger, P.C.
617 570 1276
hdinger@goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T. 617.570 1000
F: 617.523.1231

March 23, 2005

*By facsimile*

David Kovel, Esq.
Kirby McInerney & Squire, LLP
830 Third Avenue
New York, NY 10022

Re:     *Cable v. In re Public Offering PLE Antitrust Litigation*, No. 1:05-mc-10018

Dear Mr. Kirby:

I write in response to your letter of March 22.  My point was not to propose a compromise under which Mr. Cable would agree to be deposed.  Rather, I urged your colleague to defer service of a new subpoena for Mr. Cable's deposition until after class certification has been resolved since the outcome of class certification may well moot the issue whether Mr. Cable has any pertinent evidence concerning "the transactions at issue in this litigation," as Magistrate Judge Dein put it, and save both of us an unnecessary additional round of motion practice.

You state in your letter that you consider Mr. Cable's testimony pertinent to class certification.  I disagree.  In any event, I do not consider the identification of particular IPOs in which Mr. Cable represented an issuer to pertain to the transactions at issue in the litigation since your clients were not involved in any of them.  As a result, I do not believe that a subpoena directed to such IPOs would satisfy the requirements of Magistrate Judge Dein's order of March 17, 2005.  Accordingly, if you serve a new subpoena seeking to examine Mr. Cable concerning such IPOs, we will file a motion to quash it.

Sincerely yours,

Henry C. Dinger, P.C.

cc:     Fraser Hunter, Esq. (by facsimile)